[No. 09756-9. En Banc.]
Argued May 23, 2000. Decided September 14, 2000.

*In the Matter of the Disciplinary Proceeding Against* GROSVENOR ANSCHELL, *an Attorney at Law.*

594

596

*Grosvenor Anschell*, pro se.
*Douglas J. Ende*, for the Bar Association.

MADSEN, J. — Immigration attorney Grosvenor Anschell appeals the determination of the Disciplinary Board of the Washington State Bar Association (Disciplinary Board or Board) that he be suspended from the practice of law for two years for various violations of the Rules of Professional Conduct (RPC) arising out of his neglect of client matters. We affirm.

## FACTS

The facts in this case are undisputed. Anschell was admitted to the practice of law in Washington on March 8, 1954, in New York State in 1956, and in Alberta, Canada in 1964. Anschell is currently 70 years old. In 1971, he was disbarred from the Law Society of Alberta for trust account violations, and on August 20, 1976, New York indefinitely suspended his license as reciprocal discipline for the Alberta disbarment. On May 3, 1976, while on inactive status from the practice of law in Washington, Anschell was suspended for nonpayment of his bar dues. Anschell was subsequently reinstated in all three jurisdictions: in Alberta on September 24, 1981; in New York on March 30, 1982; and in Washington on October 15, 1982.

Since his readmittance to the Washington State Bar (Bar) Anschell has conducted a high volume, low fee immigration

practice in Bellevue, Washington.[1] Anschell has at most times been a sole practitioner. Anschell carries approximately 200 open cases at any given time, reviews 10 files per day, and receives 30 telephone calls per day.

## A. Individual Grievances

### 1. *Abouzied Grievance*

In April of 1992, Fayez Abouzied consulted Anschell. On October 28, 1992, he paid Anschell $430 to submit citizenship applications so he, his wife, and children could become naturalized citizens of the United States. Mr. Abouzied and his wife were both engineers. Mr. Abouzied and the couple's two children were Canadian citizens, while Mrs. Abouzied was an Egyptian citizen. Both Mr. and Mrs. Abouzied had been permanent residents of the United States for several years at the time of their first contact with Anschell.

Mr. and Mrs. Abouzied each completed an individual application for naturalization, dated October 27, 1992, which Anschell was to submit to the Immigration and Naturalization Service (INS) on their behalf. Between December 1992 and September 1994, Mr. Abouzied periodically contacted Anschell to inquire about the status of the family's naturalization applications, to which he was assured by Anschell that the applications had been filed and that there was no cause for worry. Anschell never inquired with the INS regarding the status of the applications, and as it turns out the INS did not have them.

In August 1994, the Abouzieds hired new counsel, Paul Choquette, who promptly requested that Anschell send him an affidavit declaring that the Abouzieds' naturalization applications had been filed with the INS. Anschell promised to send the affidavit by August 26, 1994, but it was not provided until September 1, 1994. In the affidavit, Anschell claims to have filed the naturalization applications.

---

[1] In his testimony before the hearing officer, Anschell stated that his practice grosses approximately $90,000 per year, resulting in a net take home pay, after expenses, of approximately $10,000 per year for Anschell. Moreover, testimony from other immigration attorneys indicates that Anschell's fees are at least three times below the normal range in his field of practice.

The processing of the Abouzieds' naturalization applications was delayed over two and a half years by Anschell's failure to file the applications in October of 1992. This delay harmed the Abouzieds financially and emotionally. They filed suit against Anschell for legal malpractice. On November 7, 1996, an order of default was entered in their favor after Anschell filed a notice of appearance but otherwise failed to answer or plead. The total judgment was for $68,483.63.

### 2. Murray-Wijelath Grievance

On October 5, 1994, Jacqueline Murray-Wijelath hired Anschell to apply for a change of visa status for herself and her daughter, both of whom were British citizens. Ms. Murray-Wijelath, who is a research scientist with a Ph.D. in biochemistry, required a change in her status from temporary professional worker to visitor/tourist. Her current status was set to expire on October 10, 1994, and she desired a change in status while looking for employment. Ms. Murray-Wijelath's daughter, Lorre, sought an adjustment in her status to become a permanent resident.

Anschell failed to submit to INS the change of status application for Ms. Murray-Wijelath's daughter, Lorre, whose visa was set to expire in October 1995. Anschell was paid a $475 retainer fee for this service and was also given a $100 filing fee.

Ms. Murray-Wijelath paid Anschell $200 in legal fees and a $75 filing fee to handle her change in status, and she gave him a copy of her INS form I-797, relating to the commencement and expiration of her visa status. Anschell did not file Ms. Murray-Wijelath's application until October 25, 1994, after her legal status had expired. Anschell also failed to comply with an INS request that he submit her form I-797 by April 26, 1995. As a result, on May 12, 1995, the INS issued a decision denying her application due to abandonment. The INS decision denying Ms. Murray-Wijelath's application indicated that she had the option to file a motion to reopen within 30 days of the decision, or submit a new application and fee. Anschell did not advise Ms.

Murray-Wijelath of the INS decision or her options, nor did he take any other action after receiving the decision.

Ms. Murray-Wijelath found employment as a research scientist with the Hope Heart Institute, and without being aware of her loss of legal status, on April 8, 1995 (prior to the INS decision) she once again retained Anschell. This time she wanted to change her status from what she thought it was, visitor/tourist, back to temporary professional worker. She also sought approval of her prevailing wage request from the Employment Security Department, so that she could obtain a work permit. Respondent did not inform her she had lost her legal status or file any of the necessary paperwork for her April 8, 1995 request..

On November 20, 1995, Ms. Murray-Wijelath wrote Anschell inquiring about the status of her application, but received no response. On January 5, 1996, she contacted Anschell once again, but received no response. On February 23, 1996, Ms. Murray-Wijelath's employer, Dr. Woods (Chief Executive Officer of the Hope Heart Institute) wrote to Anschell requesting the completion date of Ms. Murray-Wijelath's change of status application because she needed to have a work permit for her by March 1, 1996. Anschell did not reply to Dr. Woods.

In mid-March 1996, the Employment Security Department informed Ms. Murray-Wijelath that Anschell had not submitted her prevailing wage request to their office. On March 26, 1996, she informed Anschell that she had hired a new attorney, Rich Rossan, and requested that all papers relating to the filing of the INS applications for her and her daughter be sent to him. The requested information was never sent. Ultimately Anschell withdrew from this case and returned the unearned retainer paid for Ms. Murray-Wijelath's daughter's application in November 1996.

On May 6, 1996, Mr. Rossan filed the change of status application and submitted the prevailing wage request for INS approval. On June, 3, 1996, the INS approved Ms. Murray-Wijelath's prevailing wage request and issued a work permit. However, on this same date the INS also

denied the change of status applications for both Ms. Murray-Wijelath and her daughter because they were both "out of legal status." Clerk's Papers (CP) at 96. As a result of this denial, Ms. Murray-Wijelath and her daughter had to return to London, England, for approximately three weeks and reapply from there to legally reenter and successfully remain in the United States.

*3. Ponzini Grievance*

On April 7, 1995, Anthony and Christel Stach Ponzini retained Anschell to represent Mrs. Ponzini in her application for permanent resident status. Mrs. Ponzini was a German citizen and Mr. Ponzini was a United States citizen. Anschell was also retained to obtain an American passport for Mrs. Ponzini's daughter, Sinah Stach, a United States citizen who had been living in Germany.

In late April of 1995, the Ponzinis provided all the documentation requested by Anschell, including prior divorce decrees, original passports, and birth certificates. Mr. Ponzini wrote two checks for payment of the matter, both of which were given to Anschell. One was for $190 and was payment of Anschell's fee and the other was a $210 check made out to the INS to cover the filing fee.

All the necessary forms were signed and completed by the Ponzinis, and this paperwork was given to Anschell. Anschell told the Ponzinis it would take approximately three to four months to obtain an appointment with the INS. After approximately three months, Mr. Ponzini began calling Anschell to check on the status of his case. Mr. Ponzini left several messages, which were not returned, but on the occasions when he was able to get Anschell on the phone he was assured by Anschell that "he had filed [the] application." 1 Verbatim Report of Proceedings (Washington State Bar Ass'n Disciplinary Bd.) at 61.

In October of 1995, Mr. Ponzini contacted Anschell and requested proof that Mrs. Ponzini's application had been filed. Anschell promised to fax the documentation, but never did. On November 26, 1995, Mr. Ponzini sent Anschell a certified letter giving him until December 1,

1995 to send either proof that the INS application had been filed or to refund his money and the completed immigration packet. Anschell did not respond, nor has he ever refunded the legal fees paid by the Ponzinis.

In fact, Anschell did not file the application with the INS and had misplaced Mrs. Ponzini and Sinah Stach's files. He is also unable to locate Sinah Stach's original German passport and Mrs. Ponzini's original medical papers.

*4. WSBA Noncooperation Grievance*

During disciplinary investigations of five pending grievances against him, including the three at issue in this case, Anschell repeatedly failed to return telephone calls placed by the Office of Disciplinary Counsel. He also failed to respond to several written requests for information. As a result, the disciplinary counsel was twice compelled to take his deposition.

B. Procedural History

On September 10, 1997, the Bar filed a formal complaint against Anschell, alleging multiple RPC violations arising from the three consolidated client grievances noted above, as well as an additional count for failure to cooperate with the Bar's disciplinary investigation. Specifically, the complaint included the following basic allegations:

- Anschell failed to file naturalization applications with the INS for Mr. and Mrs. Abouzied and misinformed them about the status of their applications, causing a two and one-half year delay in their obtaining naturalized citizen status (counts 1-4);

- Anschell failed to submit INS applications to change the legal immigration status of Jacqueline Murray-Wijelath and her daughter and refused to respond to client inquiries about the status of the matter, resulting in a loss of his clients' legal immigration status (counts 5-10);

- Anschell failed to file an INS application for permanent resident status on behalf of Mrs. Ponzini, and failed to respond truthfully to client inquiries regarding the matter, causing a delay of several months (counts 11-14);

- Anschell violated the duty to cooperate with a Bar disciplinary investigation as required by Rules of Lawyer Discipline (RLD) 2.8 (count 15).

The parties entered into a stipulation of uncontested facts, and on April 15, 1998, a two-day hearing was held before hearing officer R. Michael Knight. The hearing officer found the following violations:

- Anschell violated RPC 1.3 (diligence) by failing to file the Abouzieds' INS applications and initiate their INS proceedings;
- Anschell violated RPC 1.4 (communication), by failing to inform the Abouzieds that their naturalization applications had not been received by the INS;
- Anschell violated RPC 1.3 (diligence) on two occasions by failing to file a timely application for a change in Ms. Murray-Wijelath's nonimmigrant status and by failing to forward a copy of the requested I-797 form to the INS;
- Anschell violated RPC 1.4(a) and (b) (communication) by failing to notify Ms. Murray-Wijelath that her application for a change in status was denied and that he had not filed her application for a change in status;
- Anschell violated RPC 1.3 (diligence) by failing to file Christel Stach Ponzini's "Petition for Alien Relative and Application to Register Permanent Residence or Adjust Status";
- Anschell violated RPC 1.4(a) and (b) (communication) by failing to return the Ponzinis' telephone calls, failing to keep them informed of the status of their case, and failing to inform them that he had lost their files;
- Anschell violated RPC 1.5(a) (reasonable fees) and RPC 1.15(d) (refunding unearned fees) by taking money from the Ponzinis but failing to perform promised services;
- Anschell violated RLD 2.8 (duty to cooperate with a Bar disciplinary investigation) by failing to promptly furnish a written response to disciplinary counsel requests.

The hearing officer also found that the evidence did not suffice to prove several counts. Most notably, he dismissed three counts alleging violations of RPC 1.1 (competence),

relating to Anschell's handling of the Abouzied, Murray-Wijelath, and Ponzini matters. He also determined that there was insufficient evidence to conclude that Anschell violated RPC 1.3 (diligence) with respect to his failure to file Ms. Murray-Wijelath's daughter's change of status application because the Bar failed to establish "that her status existed separate from that of her mother. . . ." CP at 101.

The hearing officer found suspension to be the presumptive sanction under ABA Standards 4.12 (failure to preserve client property-suspension) and 4.42(a) (lack of diligence-suspension). The hearing officer expressly determined that ABA Standard 4.41(c) (lack of diligence-disbarment) "does not apply because, even though there are multiple instances of neglect . . . this does not amount to a pattern of neglect." CP at 104. Five aggravating factors were found to apply: (1) prior disciplinary offense; (2) multiple offenses; (3) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; (4) vulnerability of victim; and (5) substantial experience in the practice of law. The hearing officer found the presence of three mitigating factors: (1) absence of a dishonest or selfish motive; (2) remorse; and (3) remoteness of prior offense.

The hearing officer concluded that a departure from the presumptive sanction was unwarranted by reason of the aggravating and mitigating factors. As such, he recommended suspension of Anschell for a period of 180 days, two years of probation after his reinstatement, and required Anschell to pay restitution in excess of $13,000.

On September 28, 1998, the Disciplinary Board reviewed Anschell's matter. The Board modified the hearing officer's conclusions of law in several respects:

- The Board unanimously determined that Anschell engaged in a "pattern of misconduct" given "the similarity of the proven misconduct and the totality of the findings. . . ." CP at 107.
- The Board unanimously concluded that Anschell acted with a dishonest or selfish motive.

- The Board determined that Anschell violated RPC 1.1 (competence) with respect to each of the grievants' matters. The votes on this modification were split by grievant (Abouzieds: 10-2; Murray-Wijelath: unanimous; Ponzini: 10-1 with one member abstaining).
- The Board unanimously concluded that Anschell engaged in a "pattern of misconduct," and that, therefore, ABA Standard 4.41(c) (lack of diligence-disbarment) does apply. CP at 109.

The Board modified the hearing officer's recommended sanction. Although the Board concluded that the "findings of fact establish a pattern of misconduct" they determined that "[t]he pattern of misconduct is not sufficiently severe to justify disbarment." CP at 109. Therefore, the Board applied the presumptive sanction under ABA Standard 4.42(a) (lack of diligence-suspension). Finding that the aggravating and mitigating factors in this case did not warrant a departure from the presumptive sanction, the Board increased Anschell's suspension to two years, followed by two years of supervised probation and restitution.[2] The vote on modification of the sanction was nine to three. The three dissenting Board members concluded that Anschell should be disbarred.

## ANALYSIS

■ The central issue we are presented with in this case is whether to affirm the two-year suspension recommended by the Disciplinary Board, adopt the hearing officer's recommendation of a six-month suspension, or impose an alternative level of sanction. *See In re Discipline of Dann*, 136 Wn.2d 67, 84-85, 960 P.2d 416 (1998) ("an appeal of the Disciplinary Board's decision carries with it the chance that we might increase the recommended sanction . . . ."). Anschell "does not dispute the sanctions recommended by

---

[2] The Board increased the amount of restitution to include the total amount of the civil judgment held against Anschell by the Abouzieds, $68,483.63.

the hearing officer." Anschell Br. at 3. Indeed, Anschell makes only one challenge to the hearing officer's findings. He contends he did not act intentionally or knowingly in his acts of misconduct. All other findings of the hearing officer may therefore be accepted as verities on appeal. *In re Discipline of Boelter*, 139 Wn.2d 81, 96 n.5, 985 P.2d 328 (1999) (citing *In re Discipline of Johnson*, 118 Wn.2d 693, 701, 826 P.2d 186 (1992) (citing *In re Discipline of Curran*, 115 Wn.2d 747, 759, 801 P.2d 962, 1 A.L.R.5th 1183 (1990)))).

■ Anschell argues the Disciplinary Board's increase of his sanction from six months to two years is unwarranted. In a catchall argument, Anschell assigns error to each of the Disciplinary Board's modifications of the hearing officer's findings; however, Anschell fails to support most of these assignments of error with argument or authority.[3] Anschell seems to have taken the approach that whatever caused the modification of the hearing officer's recommended sanction must have come from some modification entered by the Disciplinary Board and, therefore, he challenges them all. We will address each of the Disciplinary Board's modifications in turn.

■ We will uphold the hearing officer's findings of fact if they are supported by a clear preponderance of the evidence, even if the evidence is disputed. *In re Discipline of McMullen*, 127 Wn.2d 150, 162, 896 P.2d 1281 (1995); *In re Discipline of Huddleston*, 137 Wn.2d 560, 568, 974 P.2d 325 (1999). We will uphold the hearing officer's conclusions of law if they are supported by the findings of fact. *In re Discipline of Huddleston*, 137 Wn.2d at 569. "While the examiner's findings are not conclusive, they are nonetheless entitled to considerable weight, particularly when the credibility and veracity of witnesses are at issue." *In re Discipline of McMullen*, 127 Wn.2d at 162.

■ Greater weight is given to the conclusions of the Disciplinary Board regarding the recommended sanction than is given to those of the Hearing Officer. *Id*. The

---

[3] Anschell is representing himself.

Disciplinary Board is " 'the only body to hear the full range of disciplinary matters' " and has a " 'unique experience and perspective in the administration of sanctions.' " *In re Discipline of Dann*, 136 Wn.2d at 84 (quoting *In re Discipline of Noble*, 100 Wn.2d 88, 94, 667 P.2d 608 (1983)). We will " 'not lightly depart from recommendations shaped by this experience and perspective,' " *id.*, but are not bound by them either. RLD 2.1; *In re Discipline of Haskell*, 136 Wn.2d 300, 317, 962 P.2d 813 (1998).

By virtue of our plenary authority over attorney discipline matters, we retain ultimate authority for determining the appropriate sanction for an attorney's misconduct. *Id.* (citing *In re Discipline of Espedal*, 82 Wn.2d 834, 838, 514 P.2d 518 (1973)). We will adopt the Board's recommended sanction unless we can articulate a specific reason to depart from the Board's recommendation and are persuaded that the sanction is inappropriate by one or more of the following factors:

1. The purposes of attorney discipline (sanction must protect the public and deter other attorneys from similar misconduct);

2. The proportionality of the sanction to the misconduct (sanction must not depart significantly from sanctions imposed in similar cases);

3. The effect of the sanction on the attorney (sanction must not be clearly excessive);

4. The record developed by the hearing panel (sanction must be fairly supported by the record and must not be based upon considerations not supported by the record); and

5. The extent of agreement among the members of the Board (sanction supported by unanimous recommendation will not be rejected in the absence of clear reasons).

*In re Discipline of Haskell*, 136 Wn.2d at 317-18 (quoting *In re Discipline of Johnson*, 114 Wn.2d 737, 752, 790 P.2d 1227 (1990)); *see also In re Discipline of Noble*, 100 Wn.2d 88.

In making sanction determinations we utilize the

American Bar Association's *Standards for Imposing Lawyer Sanctions* (Approved Draft 1986) (ABA Standards) as a basic, albeit not conclusive, guide. *In re Discipline of Dann*, 136 Wn.2d at 77. Under the ABA Standards, we engage in a two step process. " 'First, we determine a presumptive sanction by considering (1) the ethical duty violated, (2) the lawyer's mental state and (3) the extent of the actual or potential harm caused by the misconduct. Then, we consider any aggravating or mitigating factors which may alter the presumptive sanction.' " *Id.* (citing *In re Discipline of Johnson*, 118 Wn.2d at 701).

A. Presumptive Sanction

 *1. Ethical Duties Violated*

The ethical duties violated in this case are for the most part undisputed. Anschell concedes the following violations by virtue of his failure to contest the hearing officer's findings: three violations of RPC 1.3 (diligence); three violations of RPC 1.4(a) and (b) (communication); one violation of RPC 1.5(a) (reasonable fees); one violation of RPC 1.15(d) (refunding unearned fees); and one violation of RLD 2.8 (duty to cooperate with a Bar disciplinary investigation).

The Disciplinary Board modified the hearing officer's findings in only one respect as to the ethical duties violated by Anschell. The Board determined that Anschell violated RPC 1.1 (competence) by failing to provide competent representation in all three of the grievants' matters. Anschell challenges this finding, but provides no discernible argument to support his contention. The Bar reciprocated by failing to mention the issue in its brief.

██ RPC 1.1 provides the basic rule for lawyer competence:

> A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

Anschell's actions are best described as neglectful. The

Board focused on the fact that Anschell handled each of the grievants' cases poorly by losing documents, missing deadlines, losing files, telling the clients not to worry about the delays in their respective cases, and not checking up with the INS after promising to do so. The Board also noted that Anschell testified in a deposition that he did not know what an I-797 form was, despite the fact that he was retained, in part, by Ms. Murray-Wijelath to submit this form to the INS on her behalf.[4]

The reasons cited by the Board for its modification of the hearing officer's findings do not, for the most part, implicate Anschell's legal skills, only his will or desire to put those skills to use. The difficult question is whether an attorney's competence is implicated simply because of neglect of client matters. We believe there is a distinction between "competence" and "diligence." The vast majority of competency cases involve instances where an attorney has commenced representation of a client in an area of practice in which the attorney was not experienced, and this inexperience caused injury or potential injury to the client. *See In re Discipline of Heard*, 136 Wn.2d 405, 416-17, 963 P.2d 818 (1998) (violation of RPC 1.1 where lawyer knew or should have known that a security interest in a home was not perfected); *In re Discipline of McMullen*, 127 Wn.2d at 163-64 (RPC 1.1 not implicated by attorney's failure to adhere to conflict of interest requirements). In this case, it was Anschell's lack of diligence, not his lack of competence, which caused injury to his clients.

The cases cited in the commentary to the ABA Standards also support our interpretation. *See Florida Bar v. Blaha*, 366 So. 2d 433 (Fla. 1978) (lawyer filed complaint in the wrong court and filed replevin under old rules when client

---

[4] The Board cites only this one isolated instance that could reflect poorly upon Anschell's level of competence. This isolated testimony provides an incomplete assessment of Anschell's abilities and easily could have been a simple lapse of memory or confusion over the myriad of INS forms, which are often identified by no more than a number. A thorough reading of Anschell's testimony before the hearing officer reveals his fluency in immigration matters, as well as the fact that he is often consulted for advice by other immigration attorneys.

had not obtained a security interest to support the action); *Office of Disciplinary Counsel v. Henry*, 664 S.W.2d 62 (Tenn. 1983) (lawyer took on representation of a client for charge of murder despite having never handled a felony case and filed motions based on superseded statutes); *Florida Bar v. Gray*, 380 So. 2d 1292 (Fla. 1980) (lawyer represented client in truth in lending laws case without ever becoming qualified in the area). We hold that findings of fact do not support the conclusion that Anschell violated RPC 1.1 (competence).

*2. Mental State*

■ Next, we consider Anschell's mental state. Under the ABA Standards, " '[t]he lawyer's mental state may be one of intent, knowledge, or negligence.' " *In re Discipline of McMullen*, 127 Wn.2d at 169 (citing ABA Standards 3.0 & Commentary at 25). "A lawyer acts with intent when he or she has 'the conscious objective or purpose to accomplish a particular result.' " *Id.* Knowledge is " 'the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result.' " *Id.* (quoting ABA Standards Definitions at 7). Finally, "[a] lawyer acts in negligence when he or she fails 'to heed a substantial risk that circumstances exist or that a result will follow' and that failure 'is a deviation from the standard of care that a reasonable lawyer would exercise in the situation.' " *Id.* (quoting ABA Standards Definitions at 7.)

Anschell disputes the hearing officer's finding, which was adopted by the Disciplinary Board, that "[t]he clear preponderance of the evidence establishes that [he] acted intentionally or knowingly in all his acts of misconduct." Answering Br. of the Washington State Bar Ass'n at 100. Anschell does not support his contention with any discernible argument beyond a statement that these cases "fell through the cracks," Anschell Br. at 5-6, which presumably indicates that he believes his actions were negligent at best.

The record amply supports the conclusion that Anschell went a step further than simple negligence and acted with

"knowledge." As the Bar correctly notes, the evidence established that when contacted by his clients, Anschell "represented that he had filed documents when he had not, and/or failed to inform the client that he had missed deadlines [after receiving an INS notification to that effect], and/or assured the client he would take action that he then failed to perform." Washington State Bar Association (WSBA) Br. at 32 n.15. We believe these facts go beyond the inadvertent "missing of a deadline" and are sufficient to infer awareness on the part of Anschell that he acted with "knowledge."

### 3. Extent of Harm

The next consideration is the extent of the actual or potential harm caused by the misconduct. We give " 'particularly great weight' to the question of the extent of injury involved due to the attorney's misconduct." *In re Discipline of Dann*, 136 Wn.2d at 79 (quoting *In re Discipline of Curran*, 115 Wn.2d 747, 772, 801 P.2d 962, 1 A.L.R.5th 1183 (1990)). The hearing officer found that the grievants "suffered serious or potentially serious injury/injury or potential injury." Findings of Facts at 100. The hearing officer's finding is ambiguous, in that it refers to both "injury" and "serious injury." Nevertheless, we think it is quite clear that the type of potential and actual injury in this case—risk of deportation and loss of the right to legally live and work in the United States—rises to the level of "serious injury." *See, e.g., In re Discipline of McMullen*, 127 Wn.2d at 169-70; *In re Discipline of Johnson*, 118 Wn.2d at 702 (both cases finding "serious injury").

### 4. The Presumptive Sanction

Next we review the presumptive sanction based on the three factors discussed above. The parties, the hearing officer, and the Disciplinary Board focused their analyses of the "presumptive sanction" on ABA Standards 4.41 and 4.42, both relating to a lawyer's lack of diligence. These standards state:

4.41 Disbarment is generally appropriate when:

(a) a lawyer abandons the practice and causes serious or potentially serious injury to a client; or

(b) a lawyer knowingly fails to perform services for a client and causes serious or potentially serious injury to a client; or

(c) a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to a client.

4.42 Suspension is generally appropriate when:

(a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or

(b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.

The hearing officer concluded that ABA Standard 4.41(c) (disbarment) did not apply because "even though there are multiple instances of neglect of client matters by Mr. Anschell, this does not amount to a pattern of neglect." CP at 104. The hearing officer then applied ABA Standard 4.42(a) (suspension).[5] The Disciplinary Board disagreed, finding that a "pattern of neglect" was shown in this case, but chose to apply ABA Standard 4.42 because the "pattern of misconduct is not sufficiently severe to justify disbarment." CP at 109.

The Board's discussion of this issue is confusing. In paragraph six of the Board's conclusions it rejected the hearing officer's finding that Anschell's conduct did not amount to a pattern of neglect. In doing so, however, the Board relied on the hearing examiner's findings related to pattern of misconduct in paragraph 97. The Board then went on, in paragraph 7, to state that the "pattern of misconduct is not sufficiently severe to justify disbarment. Suspension pursuant to ABA Standard 4.42 is the presumptive sanction."

■ Initially, a pattern of misconduct is not relevant

---

[5] The hearing officer also relied on ABA Standard 4.12:

Suspension is generally appropriate when a lawyer knows or should know he is dealing improperly with client property and causes injury or potential injury to a client.

under ABA Standard 4.41 or 4.42; the inquiry is whether the conduct established a pattern of neglect. Further, application of the standards relating to neglect, 4.41(c) and 4.42(b), are not dependent on the severity of the pattern. Rather, the distinction between those standards is the level of seriousness of the injuries. If the injury is "serious," disbarment is warranted, if not, suspension is the presumptive sanction. Based on the Board's erroneous conclusion that "pattern of misconduct" and "pattern of neglect" are interchangeable it is difficult to know whether the Board believed that the standard under 4.41(c) was satisfied.

In this case, however, determining the existence of a pattern of neglect is unnecessary. The Board adopted all of the hearing officer's findings and conclusions other than those explicitly modified by its decision. In doing so, the Board agreed with the hearing officer that Anschell's conduct violated ABA Standard 4.42(a). The only distinction between 4.41(b) (disbarment) and 4.42(a) (suspension) is the level of actual or potential injury to a client. The Board did find that ABA Standard 4.41(c) (pattern of neglect-disbarment) was violated, which requires "serious or potentially serious injury to a client." Since Anschell caused "serious or potentially serious injury" to his clients, the presumptive sanction, under the Board's analysis, should have been disbarment under 4.41(b), irrespective of the existence of a pattern of neglect.

B. Aggravating and Mitigating Factors

We next review any aggravating or mitigating factors that may justify a departure from the presumptive sanction. The Hearing Officer found the presence of five aggravating factors: (1) prior disciplinary offense; (2) multiple offenses; (3) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; (4) vulnerability of victim; and (5) substantial experience in the practice of law. Only three mitigating factors were found: (1) absence of a dishonest or selfish motive; (2) remorse; and (3) remoteness of prior offense. The Disciplinary Board modified the hearing

officer's conclusions by finding the presence of two additional aggravating factors: a pattern of misconduct, and the presence of a dishonest or selfish motive. By the latter, the Board necessarily rejected the hearing officer's determination that the lack of a dishonest or selfish motive was a mitigating factor.

■■■ Neither the Board nor the hearing officer believed that the existence of aggravating or mitigating factors in this case justified a departure from the presumptive sanction. Nevertheless, Anschell challenges both of the Board's modifications. First, Anschell disputes the Board's determination that he acted with a dishonest or selfish motive. Specifically, he argues that his "modest retainer fees" preclude such a finding. No authority is cited in support of this contention and we find it to be incorrect. The amount of Anschell's fees was not a basis for the Board's determination, nor is it material in any respect. We have most often found a dishonest or selfish motive in cases where an attorney steals client money, regardless of the amount. *See In re Discipline of Dann,* 136 Wn.2d at 81 (finding of a selfish motive where client was overbilled).

■■■ Nevertheless, Anschell is correct insofar as he complains the Board's finding is not supported by the record in this case. As support for its unanimous deviation from the hearing examiner's finding, the Board noted that "on several occasions, [Anschell] was diligent about collecting his fees (findings 10, 26, 28, 62 and 71), but was not diligent about performing services for those fees." CP at 107. Contrary to the Board's assertion, there is nothing in the record to support the inference that Anschell was "diligent" about collecting his fees. For each of the grievants, Anschell accepted fees prior to beginning work on their cases. That is the extent of his "diligent" collection efforts. The Board's finding seems to insinuate that at the same time Anschell was being neglectful in his legal work, he was engaging in a "diligent" collection of his fees (i.e., only remembering to send out the collection letters, not the INS forms). This conclusion is wholly unsupported by the record.

Anschell also challenges the Board's conclusion that he engaged in a "pattern of misconduct." We believe the Board was correct in its determination. Anschell committed multiple RPC violations with respect to three separate clients over an extended period of time. *See In re Discipline of Halverson*, 140 Wn.2d 475, 998 P.2d 833 (2000) (sexual relations with six clients constitutes a pattern of misconduct); *McMullen*, 127 Wn.2d at 171 (multiple violations as to one client is not a pattern of misconduct).

In the end, we come to the same conclusion as the hearing officer and the Disciplinary Board. The aggravating factors in this case are not sufficiently egregious, nor are the mitigating factors sufficiently compelling to justify a departure from the presumptive sanction on this basis.

## C. *Noble* Factors

 Disbarment is the presumptive sanction for Anschell's misconduct under ABA Standard 4.41(b). Nevertheless, we are not bound by this presumptive sanction and may ultimately evaluate this case under the *Noble* factors enumerated above. *In re Discipline of Boelter*, 139 Wn.2d at 103.

Implicated under the facts of this case is *Noble* factor two, the proportionality of the sanction to the misconduct in light of prior disciplinary decisions involving similar misconduct. We have often stressed our "commitment to consistency in attorney discipline cases." *In re Discipline of Gillingham*, 126 Wn.2d 454, 469, 896 P.2d 656 (1995) (citing *In re Discipline of Johnson*, 118 Wn.2d at 704). Accordingly, we attempt "to impose sanctions roughly proportionate to sanctions imposed in similar situations or for analogous levels of culpability." *Id.*

The Bar contends that "it is disingenuous for [Anschell] to argue that a two-year suspension is disproportional." Answering Br. of the WSBA at 40. In support of its contention, the Bar cites one pre-ABA Standards case, *In re Discipline of Talbot*, 107 Wn.2d 335, 728 P.2d 595 (1986), which it claims is factually analogous to the case at bar.

Contrary to the Bar's assertion, we find that *Talbot* provides little guidance in this case.

In *Talbot*, this court disbarred attorney Talbot for four principal acts of misconduct. First, Talbot disregarded an automatic stay of a client's bankruptcy petition by withdrawing client funds from the registry of the court to cover his legal fees. Second, in a separate client matter, Talbot failed to respond to a pending motion for summary judgment resulting in a grant of the motion to the opposing party. "[B]ut most inexcusabl[y], [he] never even informed his client that a summary judgment had been granted against her." *Id.* at 336. Third, Talbot did nothing to process an estate for which he accepted the duties of executor, and during a suit against him by the estate's heirs he failed to appear for two show cause hearings. And finally, Talbot completely failed to cooperate with the Bar during their disciplinary investigation, choosing to "ignore the whole matter." *Id.* at 337.

The misconduct at issue in *Talbot* was arguably more egregious than that of Anschell, particularly that conduct involving client funds. Additionally, attorney Talbot had been disciplined on several other occasions, over the course of years, for strikingly similar misconduct. "In 1969 he was censured for two counts of neglect of a legal matter." *Id.* at 335. In 1970, he was suspended for neglect of a legal matter. In 1971, Talbot was reprimanded for neglect of a legal matter, and in 1972 he voluntarily transferred to inactive status to avoid pending disciplinary charges.

The Bar also fails to note that *Talbot* stands in stark contrast to the vast majority of "lack of diligence" cases in which we have imposed suspensions of varying lengths of two years or less, even when there have been multiple instances of misconduct. *See In re Discipline of Johnson*, 94 Wn.2d 659, 618 P.2d 1322 (1980) (60-day suspension where attorney had received a prior reprimand for neglecting legal matters); *In re Discipline of Jamieson*, 98 Wn.2d 865, 658 P.2d 1244 (1983) (60-day suspension for prolonged neglect of a probate matter, even after being contacted six times by

the Department of Revenue regarding the case, and each time failing to respond); *In re Discipline of Loomos*, 90 Wn.2d 98, 579 P.2d 350 (1978) (30-day suspension for failing to complete a probate as agreed); *In re Discipline of Yates*, 78 Wn.2d 243, 473 P.2d 402 (1970) (45-day suspension where attorney had received a prior reprimand and censure for neglect of client matters); *In re Discipline of Yates*, 90 Wn.2d 767, 585 P.2d 1164 (1978) (one-year suspension for neglect of several client matters, plus multiple instances of prior similar misconduct); *In re Discipline of Kennedy*, 97 Wn.2d 719, 649 P.2d 110 (1982) (60-day suspension for multiple instances of neglect, including the failure to arrive in court when expected, and the failure to notify client that summary judgment had been granted in a case); *In re Discipline of Greenlee*, 82 Wn.2d 390, 510 P.2d 1120 (1973) (30-day suspension for failure to expeditiously probate an estate); *In re Discipline of Vandercook*, 78 Wn.2d 301, 474 P.2d 106 (1970) (30-day suspension for neglect and delay in handling of divorce action where attorney had been disciplined on three prior occasions for similar misconduct); *In re Discipline of Burtch*, 112 Wn.2d 19, 770 P.2d 174 (1989) (45-day suspension for a pattern of misconduct involving: three violations of RPC 1.5(b) (failure to communicate fees); six violations of RPC 1.3 and 3.2 (lack of diligence and failure to expedite litigation); two violations of RPC 1.4 (failure to keep client fully informed); two violations of RPC 1.15(d) (failure to return client documents and unearned fees); one violation of RLD 13.3 (failure to file a timely trust account declaration); and one violation of RLD 2.8 (failure to cooperate with disciplinary investigation). The sanction in this case was reduced by the mitigating factor of the attorney's financial turmoil); *In re Discipline of Felice*, 112 Wn.2d 520, 772 P.2d 505 (1989) (30-day suspension for attorney's neglect of guardianship duties, even after being informed by Department of Social and Health Services (DSHS) of the deplorable conditions in which his ward was living); *In re Discipline of Nelson*, 87 Wn.2d 77, 549 P.2d 21 (1976) (60-day suspension for neglect of four client matters); *In re Discipline of Witteman*, 108

Wn.2d 281, 737 P.2d 1268, 68 A.L.R.4th 677 (1987) (two-year suspension for multiple counts of intentional neglect and misrepresentation where attorney had three prior disciplinary actions for similar conduct).

The few cases in which we have disbarred an attorney for lack of diligence, have often involved charges of conversion of client funds, which is a violation potentially warranting disbarment in and of itself. *In re Discipline of Hawkins*, 91 Wn.2d 497, 589 P.2d 247 (1979) (attorney disbarred for extraordinary delay in closing of estate, coupled with his withdrawal and the subsequent disappearance of the estate's funds for six years); *In re Discipline of McGough*, 115 Wn.2d 1, 793 P.2d 430 (1990) (attorney disbarred for charges including lack of diligence and conversion of client funds).

An analysis of the above cases leads us to conclude that application of the ABA presumptive sanction of disbarment is clearly unwarranted in this case.[6] *See In re Discipline of Haskell*, 136 Wn.2d at 321 (imposing suspension instead of presumptive sanction of disbarment for reasons of proportionality). Nevertheless, Anschell's conduct is extremely serious. In addition he has a prior disciplinary record and he initially failed to comply with the Bar investigation against him. In light of all the circumstances, we agree with the Disciplinary Board's conclusion that a two-year suspension is warranted.

We also take particular note of the fact that Anschell, who is representing himself, has made little effort to persuade us that his conduct merits a lesser sanction. His briefing

---

[6] Three Disciplinary Board members would have disbarred Anschell. It is important to note that the dissenting members were guided in part by erroneous assumptions about the grievants in this case. Specifically, they believed that "[t]he clients put at risk were among the most vulnerable by virtue of their lack of English and the nature of immigration matters." CP at 106. All of the grievants in this case were educated and spoke fluent English. While some immigration clients may be vulnerable, these ones, which included two engineers and a research scientist, were not. We recognize that the hearing officer and the Board determined that the vulnerability of Anschell's victims is an aggravating factor in this case. For the aforementioned reasons, we have significant doubts as to the validity of this finding. Nevertheless, because Anschell has not challenged this finding, we will not disturb the Board's determination.

before this court contains only one citation to a reported court decision and is virtually devoid of argument. Additionally, the Bar Association filed a request for leave to supplement the oral argument with an affidavit casting doubt on the veracity of Anschell's assertion to this court during oral argument that he had secured the agreement of another immigration lawyer to assist with his practice. Even though granted extensions, Anschell has yet to respond.

Anschell makes one final argument. He contends that "a demand of full restitution prior to [his] reinstatement is a violation of the United States and Washington State Constitutions because it denies an attorney the right to his license to practice a profession based on a prohibited classification of financial resources." Appeal of Br. of Grosvenor Anschell at 7-8. Anschell never states what provision of the constitution is violated, nor does he explain how a payment of "restitution," which is by its very definition specific compensation for a wrong committed by Anschell himself, can in any way be viewed as discriminatory. Most importantly, as noted by the Bar, Anschell is simply incorrect factually. The Disciplinary Board did not "condition" his reinstatement on the payment of restitution, it merely determined that it was an appropriate sanction.

The Board included the entire amount of the Abouzieds' civil judgment in its restitution order. We believe this was in error. An order of restitution and a civil judgment are distinct remedies and should not be conflated. *C.f. State v. Nelson*, 53 Wn. App. 128, 766 P.2d 471 (1988). A civil judgment is subject to collection by resort to independent legal processes and may include monetary awards far greater, and significantly different, than those granted by restitution (i.e., treble damages and compensation for emotional distress). We believe it is improper to include such judgments in an attorney discipline restitution order. Therefore, we reinstate the hearing officer's original restitution order in the following amounts: $4,000 to Ms. Murray-Wijelath; $190 to Mr. Ponzini; and $9,090 plus

attorney fees paid to Mr. Anschell and Mr. Chocquette, to the Abouzieds.

## CONCLUSION

We affirm the Disciplinary Board's recommended suspension of two years followed by two years of supervised probation and reinstate the hearing officer's original order of restitution.

GUY, C.J., SMITH, JOHNSON, ALEXANDER, TALMADGE, and SANDERS, JJ., and BECKER and KATO, JJ. Pro Tem., concur.

Reconsideration denied October 30, 2000.