[No. 09756–9. En Banc.]
Argued March 27, 2003. Decided May 29, 2003.

*In the Matter of the Disciplinary Proceeding Against* GROSVENOR ANSCHELL, *an Attorney at Law.*

486

488

*Grosvenor Anschell*, pro se.

*Jason P. Holtman* and *Fredric C. Tausend* (of *Preston Gates & Ellis, L.L.P.* ), for the Bar Association.

MADSEN, J. — Grosvenor Anschell appeals from the Washington State Bar Association (WSBA) Disciplinary Board's (Disciplinary Board) decision unanimously adopting the hearing officer's recommendation that Anschell be disbarred for failing to act with diligence in an immigration matter (the Barakat matter) where he neither engaged in any action at all for his client after an initial appearance nor withdrew from the case. The Disciplinary Board also unanimously affirmed the hearing officer's determination that eight other counts against Anschell, involving two other cases and additional rule violations, were proved. We agree with the Disciplinary Board's recommendation, and order Anschell disbarred from the practice of law.

## FACTS

On May 20, 1999, the WSBA filed a formal complaint against Anschell based on three grievances, two involving immigration, and one involving a real estate transaction. Anschell failed to timely answer the complaint, and the WSBA filed a notice of motion for an order of default on July 12, 1999. On August 2, 1999, Anschell filed an answer. The WSBA filed a first amended complaint on February 29, 2000, charging Anschell with 11 counts of misconduct related to the three grievances. On November 30, 2001, after he received special disciplinary counsel's notice of motion for default, Anschell belatedly filed an answer to the amended complaint, admitting many of the factual allegations and some of the claims. On December 11, 2001, Anschell filed a "supplement" to his answer, dated December 10, 2001, raising laches as an "affirmative defense."

On December 11 and 12, 2001, the disciplinary hearing was held before Hearing Officer Thomas J. Greenan. On February 5, 2002, the hearing officer entered findings of fact and conclusions of law, rejected the "laches defense," and recommended that Anschell be disbarred from the practice of law. On July 19, 2002, the Disciplinary Board unanimously approved and adopted the hearing officer's findings, conclusions, and recommendation.

While Anschell challenges each of the legal conclusions that he violated the Rules of Professional Conduct and should be disbarred, he has not challenged any of the hearing officer's findings of fact. The following factual recitation of the three matters giving rise to the counts against him is thus drawn from the findings of fact.

*The Bolusan Matter.* Helen De Guzman Bolusan is a native and citizen of the Philippines. Eldon C. Doty is a United States citizen who was married to Ms. Bolusan's aunt. In 1987, Doty and Ms. Bolusan's aunt divorced, but continued to live together as husband and wife. Mr. Doty, Ms. Bolusan's aunt, and Ms. Bolusan agreed to try and obtain lawful permanent residence status for Ms. Bolusan

in the United States via a marriage to Doty. (According to Ms. Bolusan's testimony at the hearing, this was so that she could come and act as a housekeeper for Doty and her aunt.) In 1990, Doty obtained an alien fiancee visa for Ms. Bolusan from the Immigration and Naturalization Service (INS). Ms. Bolusan entered the United States on August 16, 1990, and she and Doty were married on August 19, 1990. Ms. Bolusan subsequently obtained lawful permanent resident status.

On or about March 1, 1993, Doty filed a petition for dissolution of the marriage.[1] Doty contacted Anschell for the purpose of a grant of immunity from prosecution for Doty and Ms. Bolusan's aunt in exchange for providing the INS with information about their involvement in obtaining permanent resident status for Ms. Bolusan. "Doty retained Respondent [Anschell] for the purpose of attempting to get Sally De Guzman [Ms. Bolusan's aunt] and him a grant of immunity." Decision Papers at 11 (Finding of Fact 5). Anschell prepared a letter to the INS stating, in part: "Please advise if you would extend immunity to my client and his former wife in exchange for full information about this lady [Ms. Bolusan] and her fraudulent status." Decision Papers at 11 (Finding of Fact 6). Doty began providing information to the INS about his marriage to Ms. Bolusan. On or about September 29, 1993, the marriage between Doty and Ms. Bolusan was dissolved.

In mid-August 1995, the INS issued a notice of intent to rescind Ms. Bolusan's permanent resident status on the ground she had procured entry into the United States by fraud or misrepresentation in order to enter a sham marriage. This decision was based in large part on the information provided by Doty.

On or about August 24, 1995, Ms. Bolusan hired Anschell (whom a friend recommended) to represent her in the

---

[1] Ms. Bolusan testified that her marriage to Doty was never consummated, that he continued to live as husband and wife with her aunt, and that the situation at Doty's became strained when she, Ms. Bolusan, made contact with a former friend and began seeing him—she and this friend were ultimately married.

rescission case. Prior to undertaking representation of Ms. Bolusan, Anschell never disclosed his prior representation of Doty, nor did he disclose to Mr. Doty material facts of his representation of Ms. Bolusan or obtain a written consent from Doty permitting this representation.

Anschell did not, after being hired, respond to the INS notice of intent to rescind.

On September 3, 1995, Ms. Bolusan married Pudieno Clemente, a naturalized United States citizen. On or about September 27, 1995, the INS rescinded Ms. Bolusan's permanent resident status and terminated her right to be employed in this country.

One year later, Anschell began preparing documents for Ms. Bolusan and her husband Mr. Clemente, including a Petition for Alien Relative and an Application to Register Permanent Residence or Adjust Status, in an attempt to obtain permanent resident status for Ms. Bolusan as Mr. Clemente's wife. In preparing the Application to Register Permanent Residence or Adjust Status, Anschell answered " 'No' " to question 10, asking " '[h]ave you, by fraud or willful misrepresentation of a material fact ever sought to procure or procured a visa, other documentation, entry into the U.S. or any other immigration benefits . . . .' " Decision Papers at 12-13 (Finding of Fact 12). In preparing the Petition for Alien Relative for Mr. Clemente's signature, Anschell answered " 'No' " to question 16, asking " '[h]as your relative ever been under immigration proceedings?' " Decision Papers at 13 (Finding of Fact 12). On or about September 30, 1996, Anschell filed these documents. At the time, federal law provided that no petition shall be approved if the alien was previously accorded preference status as the wife of a United States citizen by reason of a marriage determined to have been entered for the purpose of evading the immigration laws. Decision Papers at 13 (Finding of Fact 13) (citing and quoting 8 U.S.C. § 1154(c)). The INS scheduled a permanent residence interview for Ms. Bolusan for May 1, 1997. Because Anschell was late for

the scheduled interview, Ms. Bolusan and Mr. Clemente were not interviewed.

In the meantime, on or about March 4, 1997, the INS initiated deportation proceedings against Ms. Bolusan, based in large part on the information provided by Mr. Doty. (Thus, two matters were proceeding—consideration of the permanent residence application, and the deportation proceedings.) The deportation proceeding was scheduled for a master calendar (scheduling) hearing on April 30, 1997. Anschell appeared and entered his appearance on behalf of Ms. Bolusan. The immigration judge set the matter for a contested hearing on February 18, 1998, required any application seeking relief from deportation to be filed by July 30, 1997, and required prehearing statements to be filed at least 10 days before the hearing.

By April 30, 1997, at the latest, prior to the master calendar hearing, Anschell remembered and was aware that Mr. Doty had consulted him and sought legal advice concerning Ms. Bolusan's entry into a sham marriage with Doty, and that he, Anschell, had written, signed, and given the letter to the INS to Doty seeking immunity for Doty and Ms. Bolusan's aunt. As noted, Anschell never obtained written consent to continue his representation of Ms. Bolusan. Mr. Doty filed a grievance against Anschell when he learned that Anschell was representing Ms. Bolusan. On November 6, 1997, Anschell assured the WSBA and Doty that he would withdraw from representation of Ms. Bolusan. He did not withdraw. He remained as attorney for Ms. Bolusan until she and her husband discharged him after the February 18, 1998, deportation hearing.

However, Anschell did not file any application seeking relief from deportation on behalf of Ms. Bolusan nor did he file the required prehearing statement. On February 17, 1998, the day before the scheduled hearing, Anschell urged Ms. Bolusan to concede that her marriage had been a sham. He still had not informed Ms. Bolusan that he had previously consulted with Doty.

At the deportation hearing held on February 18, 1998, Anschell represented Ms. Bolusan, and told the INS attorney and the immigration judge that he might have a conflict of interest because of his prior representation of Doty. He did not, however, fully disclose the nature of the prior representation—that it involved the same or a substantially similar subject as his representation of Ms. Bolusan. Anschell also represented that Ms. Bolusan would not be contesting the allegations or cross-examining Doty. After learning this, the attorney and judge indicated they had no objection to Anschell's continued representation of Ms. Bolusan. Anschell requested voluntary deportation for Ms. Bolusan, and the immigration judge ordered a deportation date of February 17, 1999. Anschell waived Ms. Bolusan's right to appeal the decision.

From the findings of fact concerning the Bolusan matter, the hearing officer concluded that counts 1 through 5 were proved by a clear preponderance of the evidence (as noted, Anschell challenges all of the conclusions of law that he violated the Rules of Professional Conduct):

Count 1: Anschell's representation of Ms. Bolusan despite a conflict of interest that was not waived by Mr. Doty violated RPC 1.9 (conflicts of interest). Decision Papers at 22 (Conclusion of Law 40).

Count 2: Anschell's conduct in taking little or no action in Ms. Bolusan's case between May 1, 1997, and February 17, 1998, and/or failing to file any applications for relief from deportation by July 30, 1997, and/or failing to file a prehearing statement by the deadline 10 days before the February 18, 1998, hearing, and/or failing to disclose the conflict of interest to Ms. Bolusan in a timely manner violated RPC 1.3 (lack of diligence). Decision Papers at 22 (Conclusion of Law 41).

Count 3: Anschell's conduct in knowingly making a false statement of material fact or law to a third party when he filed the Application to Register Permanent Residence or Adjust Status containing the answer "No" to question 10, and/or when he filed the Petition for Alien Relative contain-

ing the answer "No" to question 16 "violated RPC 4.1(a) [(false statements to third parties)] and/or RPC 8.4(c) [(engaging in dishonest conduct)]." Decision Papers at 22 (Conclusion of Law 42).

Count 4: Anschell's failure to appear on time for the permanent residence interview violated RPC 1.3 (lack of diligence). Decision Papers at 22 (Conclusion of Law 43).

Count 5: Anschell's conduct in failing to disclose his prior representation of Mr. Doty to Ms. Bolusan within a reasonable time after Doty informed Anschell that a conflict of interest existed violated RPC 1.4 (communicating with a client). Decision Papers at 22-23 (Conclusion of Law 44).

Additional facts relating to the Bolusan matter (concerning subsequent events and court decisions) are addressed below.

*The Knutson Matter.* In January 1996, Anschell was designated the closing escrow agent for two residential real estate purchase and sales agreements between purchasers Theodore T. Kong and Huon K. Kong and seller Robert Woodruff. Anschell was thus responsible for receiving the proceeds from the two transactions, placing them into a trust account, and disbursing the proceeds in accord with escrow instructions. He was also responsible for preparing a HUD-1 Settlement Statement for each transaction, accurately accounting for all funds coming into his possession and disbursed by him.

The parties wanted both transactions to close in February 1996, and one did. The second called for an earnest money deposit of $2,000.00, which was deposited into Anschell's IOLTA (Interest on Lawyers' Trust Accounts) account on February 23, 1996. However, the sale did not close in February because Mr. Woodruff died prior to closing. After his death, Anschell worked with Woodruff's personal representative to close the second sale. On June 7, 1996, he had the parties sign most of the necessary documents, and on June 19, 1996, transmitted a number of these documents to Knutson Mortgage Corporation, the

Kongs' lender. Among these was a draft HUD-1 Settlement Statement, showing amounts to be collected, paid, and disbursed to the parties.

On June 15, 1996, Anschell wrote a $20.00 check on his IOLTA account payable to Federal Express. This payment was related to the second sale, but was not reflected on any HUD-1 forms Anschell prepared. On June 20, 1996, Knutson caused the proceeds of the loan to the Kongs ($108,559.07) to be wired to Anschell, and he deposited it the same day into his IOLTA account. On June 20, 1996, Anschell received a check from the Kongs for $27,763.04. He did not deposit this check into his IOLTA account until July 3, 1996.

On June 20, 1996, Anschell began making disbursements from the IOLTA account for the closing. Although before that date he was aware of the amounts that needed to be disbursed, he made only one disbursement on June 20, a check for $15,509.34 to the seller. He made additional disbursements between June 21, 1996, and August 19, 1996, although he knew all these disbursements were to be made from the escrow funds at settlement. Among other things, Anschell paid off the first mortgage on July 29, 1996, resulting in an additional amount required to pay off that mortgage.

Anschell prepared a number of HUD-1 forms, the final on December 3, 1997, more than a year after the closing date of the second sale. The amounts reflected in the HUD-1 form and the disbursements he made do not correspond. Anschell did not have sufficient records to explain how he arrived at the amounts set forth on his trust account checks or to explain the discrepancies. After August 19, 1996, there were still amounts that remained unpaid, including the premiums for mortgage insurance and title insurance. In December 1997, Anschell deposited $300.12 of his own money into the IOLTA account and used that plus funds in the account to pay these premiums.

From the findings of fact concerning the Knutson matter, the hearing officer concluded that counts 6 through 8 were

proved by a clear preponderance of the evidence (Anschell challenges each of these conclusions):

Count 6: Anschell's failure to promptly deposit the Kongs' $27,763.04 check into his IOLTA account "violated RPC 1.3[(lack of diligence)] and/or RPC 1.14 [(preserving identity of funds and property of a client)]." Decision Papers at 23 (Conclusion of Law 45).

Count 7: Anschell's failure to pay or disburse funds from his IOLTA account on or after June 20, 1996, in accordance with the escrow instructions "violated RPC 1.1,[2] 1.3 [(lack of diligence)] and/or 1.14 [(preserving identity of funds and property of a client)]." Decision Papers at 23 (Conclusion of Law 46).

Count 8: Anschell's failure to keep records and/or failure to enter appropriate accounting in the form of timely accurate HUD-1 forms regarding receipt and disbursement of the second sale's escrow funds violated "RPC 1.1[3] and/or RPC 1.14(b)(3) [(maintaining complete records of all funds and property of a client coming into the lawyer's possession and rendering appropriate accounts to the client)]." Decision Papers at 23 (Conclusion of Law 47).

*The Barakat Matter.* On March 24, 1997, Anschell was present in immigration court representing a client. Mr. Barakat[4] was also there, attending his rescheduled deportation hearing. Barakat asked Anschell to represent him; Anschell agreed. Anschell told Barakat that he would have to send him $200.00 to begin the case, but there was no discussion about total charges. Based on the agreement, Anschell completed, signed and filed with the immigration court an EIOR-28 form (Notice of Entry of Appearance as

---

[2] Although lack of competence was originally charged, RPC 1.1, the WSBA withdrew this charge. The hearing officer's conclusion that lack of competence was proved is irrelevant.

[3] Again, lack of competency was charged, but the charge was withdrawn.

[4] In the decision papers and elsewhere in the record Mr. Barakat's name is given as Mr. Barbakat. The WSBA explains in its brief that the WSBA, which has come to believe it is incorrect, provided the latter spelling and that "Barakat" is the correct spelling. We use "Barakat" in this opinion.

Attorney or Representative Before the Office of the Immigration Judge). This form included Mr. Barakat's address. On the same day, Anschell raised arguments at the master calendar hearing as to the types of relief from deportation that might be available to Mr. Barakat. The immigration judge granted Anschell until April 28, 1997, to file a brief addressing Barakat's eligibility for various relief and whether Barakat was stateless.

Anschell testified that on one occasion he went to the INS detention facility prior to receiving a brief from the INS, to see if Barakat was in custody, but he was not. Otherwise, Anschell never contacted Barakat concerning the deportation hearings, never filed a brief on behalf of Barakat after receiving the INS brief filed April 21, 1997, and never attempted to send a copy of the INS brief to any address for Barakat.

On June 19, 1997, the immigration judge ordered Barakat deported to Jordan. That decision was sent to Anschell, who never sent a copy to Barakat, nor did he inform Barakat of appeal rights, nor did he take any action to withdraw as Barakat's lawyer. Anschell also did not contact the INS to try to obtain Barakat's address.

Barakat's time for appeal expired 30 days after the June 19, 1997, decision, as Anschell was aware it would. After that time, the INS went to the address it had for Barakat, and took him into custody. Barakat hired another lawyer, who has attempted unsuccessfully to reopen the deportation proceedings.

On September 10, 1997, Barakat filed a grievance with the WSBA. On October 2, 1997, disciplinary counsel sent a letter to Anschell requesting a response to the grievance within two weeks. Anschell did not respond. On November 6, 1997, counsel sent another letter telling Anschell that unless he responded by November 19, 1997, his deposition would be taken. Anschell filed a written response November 22, 1997.

On December 23, 1997, Anschell filed a grievance against Mr. Nicholas Marchi, Mr. Barakat's attorney, claiming that

Marchi encouraged Barakat to file a "contrived" bar complaint. On January 20, 1998, the WSBA informed Anschell there was insufficient evidence of unethical conduct and that no further action was warranted.

On May 16, 1999, disciplinary counsel sent a request that Anschell furnish an additional response to the Barakat grievance. Anschell did not respond. On May 25, 1999, counsel sent another letter stating Anschell's deposition would be taken if he did not respond by June 7, 1999. On August 17, 1999, disciplinary counsel took Anschell's deposition concerning the Barakat grievance.

From the findings of fact concerning the Barakat matter, the hearing officer concluded that counts 9 through 11 were proved by a clear preponderance of the evidence (Anschell challenges the conclusions):

Count 9: Anschell failed to represent Mr. Barakat with reasonable diligence and promptness in violation of RPC 1.3 (lack of diligence). Decision Papers at 23 (Conclusion of Law 48).

Count 10: Anschell's failure to keep Barakat reasonably informed about the status of his case and/or failing to properly withdraw from representation "violated RPC 1.4(a) [(keeping client reasonably informed of status of a matter)] and/or RPC 1.15(d) [(concerning obligations of a lawyer upon withdrawing from representation)]." Decision Papers at 23 (Conclusion of Law 48 [sic]).

Count 11: Anschell's failure to cooperate fully and promptly with the WSBA during the investigation of Mr. Barakat's grievance violated former RLD 2.8 (1992). Decision Papers at 24 (Conclusion of Law 49).

The hearing officer found eight aggravating factors that may increase the disciplinary sanction imposed, including prior disciplinary offenses for which Anschell was under a two-year suspension. The hearing officer found no mitigating factors favoring a decrease in the sanction imposed. He said that Anschell's total inaction in the Barakat matter "is as egregious a lack of diligence, in an extremely serious

situation, as one is likely to encounter." Decision Papers at 25 (Conclusion of Law 54). The hearing officer concluded that the appropriate sanction is disbarment, based on the American Bar Association's *Standards for Imposing Lawyer Sanctions* standard 4.41(b), (c) (1991) (ABA STANDARDS). The hearing officer observed that the " 'ultimate sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct among a number of violations.' " Decision Papers at 25 (Conclusion of Law 54) (quoting *In re Disciplinary Proceeding Against Petersen*, 120 Wn.2d 833, 854, 846 P.2d 1330 (1993) (quoting ABA STANDARDS at 6); *see* ABA STANDARDS, *Theoretical Framework* at 5. He noted this could end the analysis, but added that Anschell's pattern of misconduct (including that for which he was under suspension), his multiple offenses, his failure to cooperate in a disciplinary investigation (which was another continued pattern), and "his known and serious conflict of interest in the Bolusan/Clemente matter, with, to date, very serious consequences to his client, Ms. Bolusan, all compel the conclusion that [Anschell] should not be allowed to continue the practice of law." Decision Papers at 25 (Conclusion of Law 54). The hearing officer therefore recommended that Anschell be disbarred.

The Disciplinary Board unanimously approved and adopted the hearing officer's findings, conclusions, and recommendation. Mr. Anschell appealed.

## ANALYSIS

### Presumptive Sanctions

█ This court gives great weight to the recommendation of the Disciplinary Board. *In re Disciplinary Proceeding Against Juarez*, 143 Wn.2d 840, 870, 24 P.3d 1040 (2001); *In re Disciplinary Proceeding Against Boelter*, 139 Wn.2d 81, 98, 985 P.2d 328 (1999). The court hesitates to reject a unanimous recommendation from the Disciplinary Board in the absence of clear reasons for doing so. *In re Boelter*, 139 Wn.2d at 98-99. However, while the court does not lightly

depart from the Disciplinary Board's recommendations, particularly where unanimous, it is not bound by them and retains the ultimate authority for determining the proper sanction for an attorney's misconduct. *In re Disciplinary Proceeding Against Anschell*, 141 Wn.2d 593, 607, 9 P.3d 193 (2000) *(Anschell I)*.

■ Under the ABA *Standards*, the court engages in a two-step process in making sanction decisions. First, the court determines a presumptive sanction, considering the ethical duty violated, the lawyer's mental state, and the extent of the harm caused by the misconduct. ABA STANDARDS std. 3.0; *In re Anschell* I, 141 Wn.2d at 608. Then the court considers aggravating or mitigating factors that may alter the presumptive sanction. *Id.* at 608; *In re Disciplinary Proceeding Against Johnson*, 118 Wn.2d 693, 701, 826 P.2d 186 (1992).

Need for recommended presumptive sanctions.

Before turning to the recommended presumptive sanction of disbarment, however, it is important to note that the hearing officer determined only the sanction appropriate for the lack of diligence violation in the Barakat matter. He did not determine the presumptive or recommended sanction for any of the other violations. Thus, with regard to most of the ethical violations found, the court does not have the benefit of the hearing officer's findings or the Board's recommendations regarding the factual issue of Anschell's mental state when committing most of the acts of misconduct, nor an assessment of the harm caused by the misconduct. The WSBA is forced to draw inferences from the record about these matters in its briefing to this court.

■ We decline, for several reasons, to make the initial determination of the applicable mental state and the extent of harm in connection with each of the violations. Both inquiries are factual in nature, and the hearing officer is in the best position to make such determinations based upon the evidence presented. Further, in light of the Disciplinary Board's experience and unique perspective in disciplinary

matters, it is fitting for that body to exercise its decision-making expertise in the first instance as to the appropriate sanction. Finally, if this court were to make these determinations in the first place, the appellant lawyer would be in a poor position to make his or her appellate argument. He or she would be dealing with unknown sanctions, based upon as yet undetermined mental state and extent of harm. Likewise, the WSBA is placed in the situation, as it is here, of making arguments drawing inferences from the record and the findings of fact.

■ We agree, as the hearing officer correctly noted, that the sanction imposed should, in general, be at least that consistent with the most serious violation. *In re Juarez*, 143 Wn.2d at 878; *In re Petersen*, 120 Wn.2d at 854. This does not mean, however, that at the disciplinary hearing only the most serious sanction need be determined. Rather, there are reasons why a presumptive sanction should be determined for each offense. First, if this court were to conclude that the particular violation for which the sanction was recommended was not supported by the record or did not warrant the recommended sanction, the court would be left without information about sanctions for other violations found. We would be forced to remand for further proceedings. This would unnecessarily extend the proceedings, with potential hardship for the attorney, the WSBA, and the hearing officer. Second, where the most severe sanction determined is less than disbarment, a determination of other recommended sanctions, involving as it would assessment of the lawyer's mental state and the harm caused, can provide useful information for deciding whether particular multiple offenses warrant a more serious, rather than a less serious sanction along a range—for example, the length of time for a suspension.

Accordingly, the hearing officer and the Disciplinary Board should determine a presumptive sanction for each ethical violation.

We do not intend this discussion to diminish the work or integrity of the hearing officer in this case in any way. To

the contrary, it is obvious that he carefully, thoroughly, and completely considered all the evidence presented, entered extensive findings and conclusions, and gave thoughtful attention to the presumptive sanction for what he saw was the most egregious ethical violation. Given the principle that the sanction to be imposed should be at least that for the most serious of the offenses, it is not altogether surprising that he believed it was necessary to determine only that sanction.

We are aware of the volunteer nature of the hearing officers' services, and gratefully acknowledge the time and effort they expend to assure the just consideration of all attorney disciplinary matters. Rather than fault the hearing officer here, we intend by this discussion to ensure that hearing officers who hear attorney discipline understand our need for a determination of a presumptive sanction for each violation. This will require additional findings and conclusions, but we trust will not be burdensome.

In the absence of the additional findings and conclusions, we will limit our discussion to the presumptive sanction recommended by the Disciplinary Board in the Barakat matter, as well as a second presumptive sanction that can fairly be gleaned from conclusions of law 40, 44, and 54, regarding the conflict of interest in the Bolusan matter.

The ethical violations.

█ █ The first question is whether the court should affirm the determinations that the alleged violations occurred. Because Anschell has not assigned error to any of the findings of fact, they are verities on appeal.[5] *In re Anschell* I, 141 Wn.2d at 606; *In re Boelter*, 139 Wn.2d at 96 n.5. Anschell does assign error to the conclusions of law, including each conclusion that he violated an ethical rule,

---

[5] In at least one case the statement of this principle inadvertently suggests that unchallenged findings are verities if unanimously adopted by the Disciplinary Board. *In re Disciplinary Proceeding Against Halverson,* 140 Wn.2d 475, 483, 998 P.2d 833 (2000). We clarify that unchallenged findings that are adopted by the Disciplinary Board are verities regardless of whether the Board's adoption is unanimous.

conclusions of law 40 through 49. His challenges to the hearing officer's conclusions of law will succeed only if conclusions are not supported by the findings of fact. *In re Boelter*, 139 Wn.2d at 90; *In re Disciplinary Proceeding Against Huddleston*, 137 Wn.2d 560, 568-69, 974 P.2d 325 (1999); *In re Disciplinary Proceeding Against Felice*, 112 Wn.2d 520, 525, 772 P.2d 505 (1989).

*The Bolusan Matter*. Anschell argues in his opening brief that regardless of any alleged conflict of interest, his services were professional and competent, and Ms. Bolusan obtained the best possible result under the circumstances. In his response brief, he "admits to possible conflict of interest that certainly did not harm Ms. Bolusan." Resp. Br. at 1.

Anschell's argument at best implicates conclusions of law 41 and 43 (concerning lack of diligence) insofar as he asserts he acted "professionally." However, the unchallenged findings establish that he failed to take action in Ms. Bolusan's case between May 1, 1997 (and was so late for her scheduled permanent residence interview on that date that the interview did not occur) and February 17, 1998, failed to file any applications for relief from deportation as instructed by the immigration judge, and failed to file a prehearing statement before the deportation hearing. Decision Papers at 13-15 (Findings of Fact 14, 15, 16, 19). The findings of fact support Decision Papers at 22 (Conclusions of Law 41, 43).

Although Anschell also claims he acted competently, the WSBA withdrew charges of incompetence, and thus this claim is irrelevant.

Finally, the bulk of Anschell's argument as to the Bolusan matter is that Ms. Bolusan was not actually harmed and his representation led to the best possible result for her. This contention concerns the degree of injury caused to the client, rather than whether violations of the Rules of Professional Conduct occurred, and will be discussed below.

*The Knutson Matter*. In his opening brief Anschell claims this was a difficult real estate closing due to the seller's

death and problems with the heirs. He says that he ended up paying out-of-pocket expenses himself, took no fees for his service, and all bills and funds were accounted for. In his response brief, he "admits that the second closing could have been handled more expeditiously and with better records." Resp. Br. at 2.

This limited discussion does not directly implicate any of the conclusions of law that Anschell violated the Rules of Professional Conduct in connection with the Knutson matter. Moreover, Mr. Anschell's claim that all funds were properly paid out in the end ignores his significant delay and mishandling of client funds, and while he apparently thinks he did well to deposit his own funds to help pay the last amounts due (late mortgage and title insurance premiums), that act itself shows his failure to preserve and account for funds coming into his possession in connection with a client's transaction.

*The Barakat Matter.* In his opening brief Anschell says that Mr. Barakat was responsible for contacting him, Anschell, and instructing him. He says that Barakat simply disappeared by his own choice, leaving no instructions on how to proceed. He says that he was unable to contact Barakat and unable to represent him. He also maintains that Barakat's grievance was a sham made to attempt to justify opening his deportation case. In his response brief, Anschell "admits he should have withdrawn promptly when his client disappeared." Resp. Br. at 2.

While Anschell did nothing in this case, Barakat was ordered deported, lost his right to appeal that order, and was arrested at the same address the INS had for him—which the record shows was the same address as listed on the notice of appearance that Anschell filed in immigration court when he was first retained by Barakat. Unchallenged Decision Papers at 19-21 (Findings of Fact 31, 32, 33, 34, 35, 36) support Decision Papers at 23 (Conclusions of Law 48, 48 [sic]) (concerning lack of diligence (RPC 1.3), failure to keep a client fully informed (RPC 1.4(a)), and failure to properly withdraw from representation (RPC 1.15).

██ *Obstruction of WSBA investigation.* Although he assigns error to Decision Papers at 24 (Conclusion of Law 49) Anschell does not devote any argument to this issue. Accordingly, his challenge to this conclusion is rejected.

We affirm the determinations of ethical violations. The unchallenged findings of fact support the conclusions that the WSBA proved the counts against Anschell.

Mental state.

██ The second consideration in determining the presumptive sanction is the lawyer's mental state. Under the ABA *Standards*, the mental state may be one of intent, knowledge, or negligence. *In re Juarez*, 143 Wn.2d at 876; *In re Anschell* I, 141 Wn.2d at 610.

As stated, the hearing officer applied ABA *Standards* standard 4.41(b), (c):

Disbarment is generally appropriate when:

. . . .

(b) a lawyer knowingly fails to perform services for a client and causes serious or potentially serious injury to a client; or

(c) a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to a client.

The hearing officer obviously concluded that Anschell's mental state was knowledge when he failed to perform services for Mr. Barakat, standard 4.41(b), and negligence in engaging in a pattern of neglect with respect to the Barakat matter, standard 4.41(c). Anschell does not directly address the propriety of these determinations. Instead, up until the point he filed his response brief, he simply denied any wrongdoing in the Barakat matter because Mr. Barakat disappeared without instructing him.

The other ethical violation leading to a sanction that can be determined from the conclusions of law is the conflict of interest violation in the Bolusan matter. The hearing officer stated, in Decision Papers at 25 (Conclusion of Law 54),

that Anschell's "known and serious conflict of interest" in this matter, "with, to date, very serious consequences to his client, Ms. Bolusan," additionally compelled the conclusion that he be disbarred for the lack of diligence in the Barakat matter. The hearing officer thus identified the mental state associated with the conflict of interest as knowledge, as well as the extent of the harm to the client.

Again, Anschell does not directly address the mental state associated with his conflict of interest, and the unchallenged findings of fact support the conclusion that he acted with knowledge.

As explained, there are no other violations where the hearing officer or the Disciplinary Board decided both the mental state and extent of harm.

We affirm the conclusions that Anschell's lack of diligence in the Barakat matter was knowing and negligent, and that his conflict of interest in the Bolusan matter was knowing.

Harm caused by the misconduct.

██ The third consideration in determining the presumptive sanction is the extent of the actual or potential injury caused by the misconduct. *In re Juarez*, 143 Wn.2d at 877. The level of "injury" can range from " 'serious' injury to 'little or no' injury . . . ." ABA STANDARDS, *Definitions* at 17.

██ Turning first to the Barakat matter and the recommended sanction of disbarment, this court observed in *Anschell* I that "we think it is quite clear that the type of potential and actual injury in this case—risk of deportation and loss of the right to legally live and work in the United States—rises to the level of 'serious injury.' " *In re Anschell* I, 141 Wn.2d at 611. Decision Papers at 19-21 (Findings of Fact 30 through 36) establish that, except for an initial appearance on behalf of Mr. Barakat, Anschell took no further action in Barakat's case, nor did he withdraw from representation. Barakat was ordered deported and missed the deadline for appealing that order. As the hearing officer said, this was "an extremely serious situation," Decision

Papers at 25, and the extent of the harm clearly at the level of "serious or potentially serious injury to a client" as required for disbarment under standard 4.41(b) and (c).

As to the conflict of interest violation in the Bolusan matter, the hearing officer said that the misconduct resulted in "very serious consequences" to Ms. Bolusan. Decision Papers at 25 (Finding of Fact 54). Anschell maintains, however, that Ms. Bolusan received the best possible result as a result of his representation. Mr. Anschell has attached to his opening brief copies of an immigration judge's order, an order dismissing Ms. Bolusan's appeal, and an INS brief to the Ninth Circuit. (Ms. Bolusan is identified as Helen Doty on these documents.) These materials concern Ms. Bolusan's attempt to reopen her deportation proceedings, with different counsel representing her.

On March 6, 1998, the immigration judge denied her motion to reopen proceedings. In regard to the conflict of interest issue raised, the judge said that former counsel stood ready to withdraw, but the issue was determined to be moot and Mr. Doty withdrew his objection. Appellant's Br., app. at 4 (Attach. to Order of the Immigration Judge). The judge found no prejudice to Ms. Bolusan. *See also* Appellant's Br., app. at 2 (Board of Immigration Appeals' Order Dismissing Appeal); Appellant's Br., app. (INS Br.).

The difficulty for Mr. Anschell, in relying on these materials, is two-fold. First, he fails to appreciate that both potential injury and injury are included within the harm that may give rise to a sanction. Second, his reliance is misplaced in light of the subsequent ruling by the Ninth Circuit overturning the two decisions he attaches. As the WSBA notes, the Ninth Circuit's view of the matter was markedly different. That court said:

> Doty [Bolusan] has demonstrated that her former attorney had a viable conflict of interest that he did not disclose to Doty before or during her representation. Her former attorney represented Eldon Doty, an adverse witness in her deportation proceeding, by writing a letter to the INS Director of Immigration claiming that Eldon Doty should be entitled to full immu-

nity in exchange for full information about the fraudulent marriage between Eldon Doty and petitioner. As the Washington State Bar Association found, this conflict of interest was not "fully disclosed in a timely fashion," sufficient information was not given to petitioner to evaluate the potential conflict . . . .

. . . .

Here, because of her former attorney's conduct, Doty was never given any opportunity at all to present her case, to testify, or to explain counsel's concession of deportability made on her behalf. Although "[p]etitioners are generally bound by the conduct of their attorneys," when there are "egregious circumstances" petitioners cannot be bound by their attorney's actions. *See Magallanes-Damian v. INS*, 783 F.2d 931, 934 (9th Cir. 1986). Because her former attorney's conflict of interest constituted an egregious circumstance, Doty's concession of deportability cannot be given any weight.

. . . .

Absent the concession of deportability, Doty had a plausible ground for relief based on her claim that she was coerced into participating in the sham marriage and was thus entitled to remain in the United States.

*Doty v. Immigration & Naturalization Serv.*, 7 Fed. Appx. 727, 730-31, 2001 U.S. App. LEXIS 6135, 2001 WL 327781 (9th Cir. 2001) (unpublished). As the WSBA notes, effective cross-examination of Eldon Doty might have yielded information tending to show he had orchestrated the sham marriage.

Although a little unclear, it appears Ms. Bolusan did not pursue the avenue left open by the Ninth Circuit's decision, but instead chose to proceed under a new federal act, at least according to Mr. Anschell. This does not mean, however, that he caused her no harm, as he claims. Among other things, the WSBA points out, when Ms. Bolusan did not leave the country within the one-year period following her deportation hearing, after deportability was conceded by Mr. Anschell, she was arrested and detained for two and one-half months in the INS detention facility. While detained, she refused to allow her children to visit because she did not want them to remember her in those circumstances.

This result might not have occurred had the conflict of interest been disclosed.

Finally, on this question, Anschell contends that conflict of interest is irrelevant unless there is a showing of harm, relying on *Mickens v. Taylor*, 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002). First, as noted earlier, harm includes actual and potential harm in the discipline standards. Second, *Mickens* is inapposite because it does not involve the issue of lawyer discipline for violation of ethical rules.

As indicated, there are no findings or conclusions specifying the extent of the harm, in terms of the ABA *Standards*, resulting from the other ethical violations.

We affirm the conclusion that Anschell's lack of diligence caused serious or potentially serious harm to Mr. Barakat, and hold that serious or potentially serious harm to Ms. Bolusan resulted from Anschell's conflict of interest.

Presumptive sanctions for violations here.

 We agree with the recommended presumptive sanction in the Barakat matter of disbarment under ABA *Standards* standard 4.41(b) and (c).

 In the Bolusan matter, the hearing officer did not identify the presumptive sanction, as we have explained. Standard 4.32 provides that "[s]uspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client." This standard refers only to "injury," however. It does not encompass the harm that occurred here—"serious or potentially serious injury." Standard 4.31, also concerning conflicts of interest violations, calls for disbarment where there is serious or potentially serious injury *and* the lawyer intends to benefit the lawyer or another, or knowingly uses information relating to the representation of a client with intent to benefit the lawyer or another. Here, there is no finding or conclusion regarding intent to benefit

Anschell or another. Thus, the presumptive sanction is suspension.

## Aggravating and Mitigating Factors

Aggravating factors.

The hearing examiner found eight aggravating factors: (1) prior disciplinary offenses, (2) dishonest or selfish motive, (3) a pattern of misconduct, (4) multiple offenses, (5) bad faith obstruction of the disciplinary proceedings by intentional failure to comply with rules or orders of the disciplinary agency, (6) refusal to acknowledge wrongful nature of conduct, (7) vulnerability of victims, and (8) substantial experience in the practice of law. Each of these is a recognized aggravating factor under the ABA *Standards* standard 9.2. Anschell challenges each aggravating factor except the eighth.

*Prior disciplinary offenses.* Anschell contends that the WSBA is guilty of laches in bringing the present charges against him. He maintains these charges should have been heard together with the charges that resulted in the two-year suspension imposed in *Anschell* I. Because the WSBA should have considered the present charges at the same time as those heard earlier, he maintains, the prior offenses should be disregarded for the purposes of the prior discipline aggravating factor.

We disagree. Whether as prior offenses, or as additional offenses considered with the present charges, the additional violations constitute an aggravating factor either as prior discipline or as additional current multiple offenses. We will not simply disregard them.

The prior violations are three violations of RPC 1.3 (diligence); three violations of RPC 1.4 (communication); one violation of RPC 1.5(a) (reasonable fees); one violation of RPC 1.15(d) (refunding unearned fees); and one violation of former RLD 2.8 (1992) (duty to cooperate with a WSBA disciplinary investigation). In addition to these violations, for which he was sanctioned in *Anschell* I, Anschell was

disbarred in 1971 from the Law Society of Alberta for trust account violations; New York indefinitely suspended his license in 1976 as reciprocal discipline based upon the Alberta disbarment; and in 1976, while he was on inactive status, this state's WSBA suspended him for nonpayment of bar dues. In 1981 and 1982 Anschell was reinstated in all three jurisdictions.

 *Dishonest or selfish motive.* We reject here, as we did in *Anschell* I, Mr. Anschell's claim that serving hundreds of clients while charging minimum fees over a 20-year period of immigration law precludes a finding that he acted with a dishonest or selfish motive. *In re Anschell* I, 141 Wn.2d at 614.

The WSBA maintains that Anschell had a selfish motive in his abbreviated explanation to the immigration court of his conflict of interest in the Bolusan matter, and his concessions of sham marriage and deportability—to conceal the extent of the conflict and its connection to the proceedings. The record supports the WSBA on this factor.

 *Pattern of misconduct.* Anschell's multiple rules violations over a number of years involving three clients establish a pattern of misconduct, as this court held with respect to the multiple violations involving three clients in *Anschell* I. *In re Anschell* I, 141 Wn.2d at 615.

Anschell maintains, however, that this aggravating factor is not justified because he has had hundreds of clients in almost 50 years of practice with few complaints of misconduct. He also says, without support, that immigration law practice is an area where many clients complain—seeming to suggest that numerous unfounded complaints are routinely filed.[6] Regardless of the number of clients Anschell has had, the present case shows a pattern of misconduct.

---

[6] Although Anschell does not support his claim, the Ninth Circuit's decision in Ms. Bolusan's case explains why higher numbers of bar complaints in immigration matters might be filed. As the court explained, in order to show that counsel erred in representation in an immigration matter, a petitioner must meet three requirements, including an allegation that a bar " 'complaint has been lodged with the bar, or reasons explaining why not.' " *Doty v. Immigration & Naturalization Serv.*, 7 Fed. Appx. 727, 2001 U.S. App. LEXIS 6135, 2001 WL 327781 (9th Cir.

And, even if there were an unusually high number of bar complaints filed in immigration matters, that would not negate the fact that the complaints against Anschell are well-founded.

 *Multiple offenses.* This aggravator is justified because Anschell committed multiple ethical violations with respect to three client matters. There is no merit to Anschell's challenge to this factor, i.e., given his almost 50 years of practice the number of complaints against him does not justify a finding of multiple offenses.

 *Obstruction of disciplinary proceedings.* The hearing officer's findings and conclusions relating to count 11, Anschell's failure to cooperate fully and promptly with the WSBA investigation, establish this aggravating factor. The WSBA urges that while the failure to cooperate is a separate count, it should also serve as an aggravator. This is what happened in *Anschell* I. *See In re Anschell* I, 141 Wn.2d at 608, 613-14.

 Anschell's only response to this aggravating factor is to say he had a busy law practice and he did cooperate with the bar. The latter statement is incorrect, and the former is no excuse.

*Refusal to acknowledge wrongful conduct.* Anschell admitted to a conflict of interest in the Bolusan matter in his opening brief in this court, but he maintains the conflict caused no harm. Earlier in these proceedings his consistent position was that he never represented Mr. Doty and so there was no conflict. He plainly does not consider his conduct to be any cause for concern. The WSBA also points out that rather than refunding unearned fees to Ms. Bolusan (he obtained part of the fee after he knew of the conflict), he has refused to return $700 of the fees paid him. He also has maintained that the $300 he did repay to the Clementes was just a "gift." He continues to take the position that Ms. Bolusan was responsible for her own

2001) (unpublished) (quoting *Lata v. Immigration & Naturalization Serv.*, 204 F.3d 1241, 1246 (9th Cir. 2000)).

problems. In the Knutson matter, Anschell admits in his opening brief to delay but says in his response brief that there was no harm to anyone. This response also shows rationalization, as well as a complete disregard for the need to properly maintain his trust account and preserve client funds. In the Barakat matter, Anschell admitted in his opening brief that he failed to appear in court for Barakat. In his response brief, he says he should have withdrawn from representation. However, his position up to that point had consistently been that it was Mr. Barakat's responsibility to contact him and provide instructions; otherwise, he, Anschell, had no obligation to do anything despite the fact he was attorney of record for Mr. Barakat. His belated concession appears solely aimed at countering this aggravating factor, rather than a true acknowledgment of wrongful conduct.

■ *Vulnerability of victims.* The hearing officer did not explain this aggravating factor. It is probably true that a number of persons who obtain the services of an immigration attorney are vulnerable due to unfamiliarity with the system and cultural and language differences. However, the record does not show that Ms. Bolusan was under any physical or mental disability or was otherwise particularly vulnerable. *See In re Disciplinary Proceeding Against Carmick*, 146 Wn.2d 582, 606, 48 P.3d 311 (2002) (rejecting vulnerability of victim as aggravating factor where the record did not support a showing of physical or mental disability or other vulnerability). It does show that she was completely dependent upon Anschell for his advice in her immigration proceedings, and that she was trusting. This does not amount to a showing of vulnerability. *See id.* Mr. Barakat's vulnerability, or lack thereof, is unknown. The Knutson matter was not an immigration matter at all—and there is no known reason for concluding any victims were vulnerable.

While none of Anschell's arguments directly addresses vulnerability, the findings do not support this aggravating factor.

*Substantial experience in the practice of law.* Anschell agrees with this factor.

Mitigating factors.

The hearing officer found no mitigating factors. Mr. Anschell claims the following mitigating factors compel a lesser sanction than the presumptive sanction:

■ *Delay.* As noted, Anschell raised laches as an affirmative defense. However, the hearing examiner found no inexcusable delay and no prejudice. We agree. Anschell also argues that the WSBA's delay in bringing the present charges to hearing is a mitigating factor.

■ ■ Delay may be a mitigating factor. *See In re Disciplinary Proceeding Against Tasker*, 141 Wn.2d 557, 567-68, 9 P.3d 822 (2000); *In re Disciplinary Proceeding Against Huddleston*, 137 Wn.2d 560, 576, 974 P.2d 325 (1999). Anschell suggests that his financial circumstances have worsened as time has passed, and therefore delay should be a mitigating factor. This court has concluded that financial problems are not mitigating. *In re Juarez*, 143 Wn.2d at 880; *In re Disciplinary Proceeding Against Curran*, 115 Wn.2d 747, 774, 801 P.2d 962 (1990). He also points out he has grown older and his health has declined as a result of the passage of time. We find these are not mitigating circumstances.

■■ *Age; lack of intent to harm.* Anschell claims his age, 73, and lack of intent to harm are mitigating factors. He relies on *In re Disciplinary Proceeding Against Malone*, 107 Wn.2d 263, 728 P.2d 1029 (1986). That decision, handed down before the court adopted the ABA *Sanctions* as guidance, was regarded as "unique." *In re Malone*, 107 Wn.2d at 268. It involved an attorney who was charged with misappropriation and mishandling of client funds. The attorney himself brought discrepancies in his bookkeeping account to the attention of the bar when he learned his bookkeeper had been stealing money from him for years (although the thefts did not have to do with his violations). *Id.* at 264-65. The attorney also volunteered in a coopera-

tive manner throughout the audit of his accounts, and had appeared to be a competent lawyer for 32 years with no complaints. *Id.* at 265. No clients were ever shorted any trust funds. *Id.* The court also noted that the attorney was 62 and unlikely to practice many more years, and thus a suspension followed by probation was sufficient to protect the public. *Id.* at 268. The court also noted the lack of any intentional defalcation and the unlikelihood of any repeat violations. *Id.* Anschell's case bears no resemblance to *Malone* and we decline to consider his age and lack of intent to harm as mitigating factors.

■■ *Service to community.* Anschell claims he has helped many low-income people at a low or no fee basis. If this is a claim that he performed pro bono legal work, it is insufficient because he offers only the bare assertion. Insofar as Anschell refers to low fees, the court has previously said that the amount of Anschell's fees is not "material in any respect." *In re Anschell* I, 141 Wn.2d at 614.

*Lack of serious harm to clients.* Anschell says that Ms. Bolusan received the best possible outcome, that Knutson Mortgage Corporation was not damaged at all, and that Barakat caused his own problems by disappearing. The first of these claims is contradicted by the findings of fact and the Ninth Circuit's decision, as well as by the fact that the INS detained Ms. Bolusan for two and one-half months. The second, in the Knutson matter, overlooks the seriousness of the harm to the public, the legal system, and the profession that results from mishandling trust accounts and client funds. The only way that Anschell averted actual financial loss to a client was by depositing his own funds into his account and forgoing fees. As to the third, the Barakat matter, Anschell is simply wrong.

*Remoteness of prior offenses.* Anschell maintains that any prior discipline was in 1971, over 30 years ago, reasoning that the multiple offenses in connection with the three clients considered in *Anschell* I should not count because those charges and the present charges should have been brought together.

This is not a mitigating circumstance. Anschell in fact did commit the additional multiple offenses, and the very multiplicity in the 1990s before his suspension indicates the sanction should be aggravated, not mitigated.

We uphold all the aggravating factors except vulnerability of victims, and we agree with the hearing officer's conclusion that there are no mitigating factors.

## The *Noble* Factors

██ ██ On the basis of the aggravating factors and lack of mitigating factors, we conclude that the presumptive sanction of disbarment should not be reduced. The remaining part of our analysis is to determine whether there is a reason to alter the sanction of disbarment based upon factors that have come to be called the *Noble* factors. *In re Disciplinary Proceeding Against Noble*, 100 Wn.2d 88, 667 P.2d 608 (1983). In our recent decision in *In re Disciplinary Proceeding Against Kuvara*, 149 Wn.2d 237, 66 P.3d 1057 (2003), we held that only two of five originally identified factors, proportionality and extent of agreement among the Disciplinary Board members, are to be considered, reasoning that the other three are duplicative of the analysis under the ABA *Standards*.

We add, however, that the ABA *Standards* encompass what we identified as the proportionality factor in *Noble*. We are preserving this aspect of *Noble* only insofar as the attorney brings forward cases to try to persuade us that the recommended sanction is disproportionate.

Proportionality.

Proportionality concerns whether the recommended sanction is proportionate to the misconduct. *In re Noble*, 100 Wn.2d at 98. Anschell brings to the court's attention nine disciplinary cases in an attempt to show disbarment is a disproportionate sanction. We are unpersuaded.

Three of the cases reported in the *Washington State Bar News* are inapposite because they involve stipulations: *In re*

*Disciplinary Proceeding Against Mestel*, 56 *Wash. St. Bar News*, No. 2, Feb. 2002, at 50; *In re Disciplinary Proceeding Against Kleweno*, 56 *Wash. St. Bar News*, No. 8, Aug. 2002, at 51; and *In re Disciplinary Proceeding Against Dinwiddie*, 56 *Bar News, supra*, at 52. A stipulation is analogous to a plea agreement, and thus irrelevant in determining proportionality of attorney discipline. *In re Boelter*, 139 Wn.2d at 103.

*In re Disciplinary Proceeding Against Burtch*, 112 Wn.2d 19, 770 P.2d 174 (1989), involved numerous rule violations involving a pattern of neglect, failure to communicate with clients, failure to properly handle fee arrangements, lack of diligence, violation of trust account agreements, and failure to cooperate in the WSBA investigation. The attorney had prior disciplinary offenses. The court imposed a 45-day suspension and two years' probation. The court concluded that a major mitigating factor existed, i.e., personal and emotional problems that may have led to a degree of mental impairment—including a costly dispute with a former partner, financial disaster, depression, separation from his wife, and bankruptcy. The court said that these circumstances "justify more leniency than we otherwise would be inclined to grant." *Id.* at 28.

Unlike the circumstances in *Burtch*, Anschell has not shown any similar personal or emotional problems, or any possible mental impairment.

*In re Disciplinary Proceeding Against Witteman*, 108 Wn.2d 281, 737 P.2d 1268 (1987), concerned nine counts involving neglect of client matters and subsequent misrepresentation concerning the status of matters. The attorney had an extensive prior disciplinary record, and initially failed to cooperate with the WSBA. The attorney was suspended for two years, followed by a two-year period of probation. As the WSBA notes, this case is distinguishable because (1) the Disciplinary Board was not unanimous in its recommendation of disbarment (three members dissented), and (2) there was an outpouring of support for the attorney from the legal community, including from judges.

Also, the court noted as mitigating factors the attorney's good reputation in the community, the absence of any selfish or dishonest motives, for the most part, and the availability of restitution to the clients through malpractice insurance.

Here, the Board's recommendation was unanimous; there is no showing of support for Anschell from the legal community and no mitigating factors apply.

Two additional cases were reported in the *Bar News*: *In re Disciplinary Proceeding Against Grashin*, 56 *Wash. St. Bar News*, No. 6, June 2002, at 53, and *In re Disciplinary Proceeding Against Hardesty*, 56 *Wash. St. Bar News*, No. 10, Oct. 2002, at 52. Grashin revised a client's will to include large gifts to organizations he had a personal interest in, rather than following the client's instructions. Grashin was suspended from the practice of law for 12 months. Hardesty represented a husband in a dissolution action at the same time he represented the wife's corporation, which was the main asset of the couple. Hardesty was admonished for failure to avoid a conflict of interest. Neither of these cases involves the multiplicity of violations as the present case or the numerous aggravating factors.

In *In re Tasker*, 141 Wn.2d 557, the Disciplinary Board recommended disbarment. This court said that at the heart of this recommendation were the findings, unanimously adopted by the Disciplinary Board, that Tasker "knowingly commingled personal funds in his trust account, knowingly used the trust account to pay personal expenses without client authorization, and intentionally violated the trust account rules to avoid payment of court-ordered child support . . . ." *Id.* at 565. The court found that unjustified delay in the WSBA's prosecution of the case and the attorney's rehabilitation during that delay (bringing himself into full compliance with the ethical rules governing trust accounting while practicing law during the delay) called for a lesser sanction of two years' suspension.

There is no showing in Anschell's case of unjustified delay, nor of rehabilitation. These considerations, and in

light of the presumptive sanction of disbarment in the Barakat matter, exacerbated by the multiple violations for which no sanctions were determined, and numerous aggravating factors in the face of no mitigating factors, distinguish Anschell's case from *In re Tasker*.

Finally, Anschell relies on *In re Carmick*, 146 Wn.2d 582. There, this court imposed a 60-day suspension for misrepresenting an ex parte order to the superior court and for negotiating directly with an adverse party the attorney knew or should have known was represented by counsel. The court found violations of RPC 3.3(f), 3.5(c), and 4.2, and, given the relevant mental states and extent of injury, determined the presumptive sanctions to be suspension and reprimand. The court also upheld three of seven aggravating factors found by the Disciplinary Board—a prior disciplinary offense, multiple violations of the RPCs, and experience in the practice of law.

In contrast, the presumptive sanction for Anschell's lack of diligence in the Barakat matter is disbarment, his present violations far exceed in number those in *In re Carmick*, and there are far more aggravating factors in this case. The two cases are dissimilar.

Extent of agreement among Disciplinary Board members.

Under the second remaining *Noble* factor, the weight given to the Disciplinary Board's recommendation may vary according to the degree of agreement among the members. Here, the Disciplinary Board unanimously affirmed and adopted the hearing officer's recommendation of disbarment.

Neither of the two *Noble* factors provides a reason to depart from the Disciplinary Board's recommended sanction.

## CONCLUSION

Although there are no recommended sanctions for most of the ethical violations in this case, we are able to determine

that the recommended sanction of disbarment for the lack of diligence in the Barakat matter is the proper sanction. We ask, however, that in the future, hearing officers presiding over attorney discipline cases and the Disciplinary Board determine a presumptive sanction for each offense. Our review of recommended sanctions for an attorney's violations of the ethical rules is facilitated by a decision and recommendation that contains an analysis of the presumptive sanction for each violation.

The Disciplinary Board's adoption of the hearing examiner's findings, conclusions, and recommendation of disbarment is supported by the unchallenged findings of fact relating to the Barakat matter. The seven aggravating factors that we uphold, the lack of mitigating factors, and the numerous additional violations for which no sanction was determined compel our agreement with the Board's recommendation that Mr. Anschell be disbarred.

We order Grosvenor Anschell disbarred from the practice of law and his name stricken from the roll of attorneys in this state.

ALEXANDER, C.J.; JOHNSON, SANDERS, IRELAND, CHAMBERS, OWENS, and FAIRHURST, JJ.; and ARMSTRONG, J. PRO TEM., concur.

Reconsideration denied July 22, 2003.